## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Southern Division

| | | |
|---|---|---|
| **JAYLEN BRANTLEY and JARED NICKENS,** | * | |
| **Plaintiffs,** | * | |
| **v.** | * | **Case No.: 8:19-cv-594-PWG** |
| **EPIC GAMES, INC., JOHN AND JANE DOES 1 THROUGH 50, and JOHN DOE CORPORATIONS 1 THROUGH 10,** | * | |
| | * | |
| **Defendants.** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION AND ORDER

Plaintiffs Jaylen Brantley and Jared Nickens bring this action against Defendant Epic Games, Inc. for the alleged unauthorized appropriation of the dance the "Running Man" that they allegedly created, named, and popularized.[1]   Plaintiffs claim that Epic Games intentionally copied the movements of the "Running Man" dance and incorporated them as a feature of its highly popular online video game *Fortnite*.  They bring eight causes of action under common law and the federal Lanham Act for invasion of the right of privacy/publicity, unfair competition, unjust enrichment, trademark infringement, trademark dilution, and false designation of origin.  Plaintiffs seek both compensatory and injunctive relief.  Epic Games now moves to dismiss the claims against it.[2]  For the reasons discussed below, Epic Games' motion to dismiss is granted and Plainitffs' claims are dismissed with prejudice.

---

[1] Brantley and Nickens also name as Defendants John and Jane Does 1 through 50 and John Doe Corporations 1 through 10 as "the creators and developers of the Fortnite video game franchise." ECF No. 18, Am. Compl., ¶ 6.  I will refer to all defendants collectively as "Epic Games" or

[2] The motion is fully briefed.  *See* ECF Nos. 27, 28, 29.  A hearing is not necessary.  *See* Loc. R. 105.6 (D. Md. 2018).

## Background

Plaintiffs Brantley and Nickens allege that in 2016 they created, named, and popularized the dance move which they titled the "Running Man."  Am. Compl. ¶¶ 2, 3, 9.  Brantley and Nickens allege that they incorporated the dance into breaks at University of Maryland basketball games, and that the dance subsequently went viral on social media.  *Id.* ¶ 10. Plaintiffs claim to have incited the online popularity of the Running Man by challenging others to imitate the dance and post the performance on social media.  *Id.*  They state that the Running Man videos have over 100 million views on YouTube and thousands of people have posted videos of themselves performing the dance.  *Id.* ¶ 11.

The popularity of the "Running Man Challenge" allegedly exploded in part after a live performance of the dance by Brantley and Nickens on the *Ellen DeGeneres Show*.  *Id.* ¶ 2. While Plaintiffs repeatedly allege in their complaint that they "created" the dance, during the *Ellen* segment two high school students from New Jersey – Kevin Vincent and Jeremiah Hall – are credited with creating the dance. ECF No. 27-2 (video of *Ellen* segment).[3]  Brantley and Nickens appear later in the segment and state that *they* copied the dance from a video that they saw on Instragram.  *Id.*  Nonetheless, Brantley and Nickens claim that the "Running Man" has become synonymous with them.  Am. Compl. ¶ 13.

Defendant Epic Games is the creator and developer of the *Fortnite* video game franchise.  *Id.* ¶ 16.  *Fortnite* is a free-to-play online multiplayer video game which supports

---

[3] Although the video of the *Ellen* segment was included as an exhibit to Epic Games' Motion to Dismiss, and not attached to the Complaint, I take judicial notice of it without converting the motion to one for summary judgment, as the video is central to Plaintiffs' claims, was incorporated by reference in the Complaint, and its authenticity is not in dispute.  *See* Am. Compl. ¶ 2; *Witthohn v. Federal Ins. Co.*, 164 Fed. Appx. 395, 396 (4th Cir. 2006) (When reviewing a motion to dismiss, "a court may consider . . . documents central to plaintiff's claim, and documents sufficiently referred to in the complaint so long as the authenticity of these documents is not disputed.")

up to one hundred players during a single game. *Id.* ¶¶ 17, 18. *Fortnite* allows each player to select and create their own individualized avatar which is extensively customizable. *Id.* The players then compete in a battle-royale style shooting match where the last player standing is declared the victor. *Id.* ¶ 17. At any point during the match, the player can command their online avatar to perform programmed movements called "emotes" which express the player's emotions in the game. *Id.* ¶¶ 20, 21. *Fortnite*'s massive popularity can be attributed not just to its gameplay, but also to the incorporation and popularity of in-game emotes. *Id.* ¶ 21.

Because *Fortnite* is free-to-play, the game is primarily supported by purchases made at the game's electronic storefront. *Id.* ¶ 18. At the electronic storefront, players can purchase various customizations for their online characters including costumes, equipment, and unique emotes. *Id.* In July 2018, Epic Games produced a new emote which was called the "Running Man" emote (the "Emote"). *Id.* ¶ 26. The Emote could be purchased for roughly five dollars on the *Fortnite* electronic storefront or purchased as part of a package included with the latest installment of *Fortnite*. *Id.*

Brantley and Nickens allege that Epic Games created the Emote by impermissibly copying the movements of the "Running Man" dance and profited from the sale of the Emote on the *Fortnite* electronic storefront. *Id.* ¶¶ 26–28, 32. Brantley and Nickens bring a total of eight causes of action against Epic Games under theories of invasion of the right of privacy/publicity, unfair competition, unjust enrichment, trademark infringement, trademark dilution, and false designation of origin. Epic Games moves to dismiss the claims against it.

### Standard of Review

Plaintiffs' claims are subject to dismissal if they "fail[] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The purpose of Rule 12(b)(6) "is to test the

sufficiency of a complaint and not to resolve contests surrounding the facts, the merits or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). A pleading must meet the standard of Rule 8(a), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain factual content, and more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). Therefore, mere legal conclusions will not suffice. *Iqbal*, 556 U.S. at 678. Finally, the factual allegations presented in the complaint must be construed "in the light most favorable to [the] plaintiff." *Adcock v. Freightliner LLC*, 550 F.3d 369, 374 (4th Cir. 2008).

### Discussion

Epic Games argues that the Copyright Act preempts Brantley and Nickens' claims for invasion of the right of privacy/publicity (Count I), common law unfair competition (Count III) and unjust enrichment (Count IV). Similarly, Epic Games argues that Brantley and Nickens' claims for Lanham Act unfair competition (Count II) and false designation of origin (Count VII) are precluded by the Copyright Act. Finally, Epic Games argues that Plaintiffs failed to plausibly allege a valid trademark for their claims for Lanham Act trademark infringement (Count V), common law trademark infringement (Count VI), and Lanham Act trademark dilution (Count VII).[4] I agree.

### I.   Plaintiffs' Common Law Privacy, Unfair Competition, and Unjust Enrichment Claims are Preempted by the Copyright Act

The Copyright Act expressly preempts a broad array of other claims. Specifically, § 301

---

[4] Epic Games also argues that Brantley and Nickens' claims should be dismissed under First Amendment principles and for failure to state a claim. Because I dismiss the claims for the reasons discussed herein, I do not address these arguments.

of the Copyright Act states as follows:

> On or after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title.  Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301.  This statutory language establishes a two-prong test for determining copyright preemption: "first, the work must be within the scope of the subject-matter of copyright as specified in 17 U.S.C. §§ 102, 103, and second, the rights granted under state law must be equivalent to any exclusive rights within the scope of federal copyright as set out in 17 U.S.C. § 106."  *U.S. ex rel. Berge v. Bd. of Trustees of the Univ. of Alabama*, 104 F.3d 1453, 1463 (4th Cir. 1997) (quoting *Rosciszewski v. Arete Assocs.*, Inc., 1 F.3d 225, 229 (4th Cir. 1993)) (internal quotation marks omitted).  I analyze each of these prongs in turn.

### a.   The Running Man is Within the Subject Matter of Copyright

Under the first prong of the test for copyright preemption, I must consider whether the work in question – the Running Man dance – falls within the subject matter of copyright as specified in sections 102 and 103 of the Copyright Act.  As relevant here, section 102(a) provides that "Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories: . . . choreographic works." 17 U.S.C. § 102(a).  Section 102(b) provides that "[i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it

is described, explained, illustrated, or embodied in such work."  17 U.S.C. § 102(b).  In other words, copyright protection extends to original works of authorship in a tangible medium including choreographic works, but not for any ideas embodied in a work.

However, the scope of copyright *preemption* is broader than the scope of copyright *protection*.  *See Berge*, 104 F.3d at 1463 (rejecting argument that a claim is not preempted because it falls within "ideas and methods" excluded from copyright protection because "the shadow actually cast by the Act's preemption is notably broader than the wing of its protection."); *Alliance for Telcoms. Indus. Sols., Inc. v. Hall*, No. CCB-05-440, 2007 WL 3224589, at *10 (D. Md. Sept. 27, 2007) ("The inquiry is limited to whether a work comes under the scope of the Act, and not whether it is actually protected . . . ."); *see also Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 849 (2d Cir. 1997) ("Copyrightable material often contains uncopyrightable elements within it, but [the Copyright Act] . . . bars state-law . . . claims with respect to uncopyrightable as well as copyrightable elements."); *Fin. Info., Inc. v. Moody's Inv'rs Serv.*, 808 F.2d 204 (2d Cir. 1986) ("As long as the work fits within one of the general subject matter categories of sections 102 and 103, the bill prevents the States from protecting it even if it fails to achieve Federal statutory copyright because it is too minimal or lacking in originality to qualify.") (quoting H.R. Rep. No. 1476, 94th Cong., 2d Sess., 131 *reprinted in* 1976 U.S. Code Cong. & Ad. News, 5659, 5747).

The analysis under this first prong of the test for copyright preemption is the same for Brantley and Nickens' invasion of the right of privacy/publicity, common law unfair competition and unjust enrichment clams, because they are all based on the alleged copying and use of the Running Man dance.  *See* Am. Compl. ¶¶ 27–28, 36–37, 52–53, 60–61.  Section 102(a) of the Copyright Act explicitly includes within its list of protected authorships, "choreographic works."

17 U.S.C. § 102(a).  Plaintiffs argue that they allege that the Running Man is a "dance," and not a "choreographic work," and therefore it is not the subject of copyright.  The U.S Copyright Office has published a Compendium of U.S. Copyright Practices that provides an explanation of how it considers the distinction between a choreographic work and dance, which provides a useful guide:

> The Office defines choreography as the composition and arrangement of "a related series of dance movements and patterns organized into a coherent whole." [*Horgan v. Macmillan, Inc.*, 789 F.2d 157, 161 (2d Cir. 1986)] (quoting Compendium (Second) § 450.03(a)).  By definition, choreography is a subset of dance.  As such, a work of authorship cannot be registered as a choreographic work unless it is comprised of dance steps, dance movements, and/or dance patterns.  However, the term choreography is not synonymous with dance.  The legislative history for the 1976 Copyright Act clearly states that "'choreographic works' do not include social dance steps and simple routines."  H.R. Rep. No. 94-1476, at 54 (1976), *reprinted in* 1976 U.S.C.C.A.N. at 5667; S. Rep. No. 94-473, at 52 (1975).

U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 805.1 (3rd ed. 2017).  The Copyright Office states that choreographic works typically contain one or more of the following elements: rhythmic movements in a defined space, compositional arrangement, music or textual accompaniment, dramatic content, presentation before an audience, and execution by skilled performers.  *Id.* § 805.2.

Choreographic works are distinguished from de minimis movements, dance steps, social, dances, and simple routines, which are not copyrightable.  The Copyright Office explains:

> Individual movements or dance steps by themselves are not copyrightable, such as the basic waltz step, the hustle step, the grapevine, or the second position in classical ballet.  *Id.* (quoting *Compendium (Second)* § 450.06).  Likewise, the U.S. Copyright Office cannot register short dance routines consisting of only a few movements or steps with minor linear or spatial variations, even if the routine is novel or distinctive.  *Cf.* 37 C.F.R. § 202.1(a).  The individual elements of a dance are not copyrightable for the same reason that individual words, numbers, notes, colors, or shapes are not protected by the copyright law.  Individual dance steps and short dance routines are the building blocks of choreographic expression, and allowing copyright protection for these elements would impede rather than foster creative expression.  *See Horgan,* 789 F.2d at 161 (quoting *Compendium (Second)*

§ 450.06). . . .

When Congress extended federal copyright protection to choreography, it intended to protect expressive works of authorship, such as ballet or modern dance.  However, Congress did not intend to protect all forms of dance or movement.  The legislative history specifically states that "choreographic works do not include social dance steps and simple routines."  H.R. Rep. No. 94- 1476, at 54 (1976), reprinted in 1976 U.S.C.C.A.N. at 5667; S. Rep. No. 94-473, at 52 (1975).  Thus, the U.S. Copyright Office cannot register a claim to copyright in social dances or simple routines, because they do not constitute copyrightable subject matter.

*Id.* § 805.5(A)–(B). Thus, "[t]he dividing line between copyrightable choreography and uncopyrightable dance is a continuum, rather than a bright line.  At one extreme are ballets, modern dances, and other complex works that represent a related series of dance movements and patterns organized into a coherent compositional whole.  At the other extreme are social dances, simple routines, and other uncopyrightable movements . . . . Many works fall somewhere in between." *Id.* § 805.5(B).

In a similar case, *Pellegrino v. Epic Games, Inc.*, the United States District Court for the Eastern District of Pennsylvania recently analyzed this distinction between choreography and dance for the purposes of copyright preemption regarding another *Fortnite* emote.  *Pellegrino v. Epic Games, Inc.*, No. CV 19-1806, 2020 WL 1531867 (E.D. Pa. Mar. 31, 2020).  In that case, Leo Pellegrino, a professional saxophone player, alleged that Epic Games copied his signature dance movement involving turning his legs and feet to the side while playing the saxophone to create the "Phone It In" emote in the Fortnite game.  *Id.* at *2.  Like here, Pellegrino brought claims for violation of rights of privacy and publicity, unjust enrichment, unfair competition, trademark infringement, and trademark dilution.  *Id.*  The Court dismissed Pellegrino's state law trademark infringement claim after finding that it was preempted by the Copyright Act.[5]  In

---

[5] The court dismissed Pellegrino's other claims, except for his Lanham Act claim for false endorsement, for other reasons.  *See Pellegrino v. Epic Games, Inc.*, No. CV 19-1806, 2020 WL

reaching this conclusion, the court looked to the Copyright Act's compendium and held that Pellegrino's "Signature Move" was a dance within the subject matter of copyright under the first prong of the copyright preemption test:

> At issue therefore is whether dance falls within the subject matter of copyright. We conclude that it does.  Specifically, we find that dance falls within the ambit of the copyright category "choreographic works." 17 U.S.C. § 102(a)(4). Although "the term choreography is not synonymous with dance," the U.S. Copyright Office, Compendium of U.S. Copyright Office Practices (3rd ed. 2017) (the "Compendium"), defines choreography as a "subset of dance [because] a work of authorship cannot be registered as a choreographic work unless it is comprised of dance steps, dance movements, and/or dance patterns." *Id.* § 805.5(B)(3); *see also id.* § 805.5(B) ("The dividing line between copyrightable choreography and uncopyrightable dance is a continuum, rather than a bright line.").  In fact, to register a claim to copyright in a choreographic work, the U.S. Copyright Office requires that "the [proposed] work is a dance." *Id.* § 805.4.  We therefore conclude that the Signature Move, which is alleged to be a dance, is the appropriate subject matter of copyright law in satisfaction of the first prong of the test for copyright preemption.

*Pellegrino v. Epic Games, Inc.*, No. CV 19-1806, 2020 WL 1531867, at *8 (E.D. Pa. Mar. 31, 2020).

Whether the Running Man dance could be subject to copyright protection is a closer question.  It has some characteristics of a choreographic work: it consists of rhythmic movements in a defined space, has music accompaniment, and was presented before an audience. *See* Am. Compl. ¶¶ 9–10; ECF No. 27-2; U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 805.2 (3rd ed. 2017).  However, it could also be compared to a dance step, like "the basic waltz step, the hustle step, the grapevine, or the second position in classical ballet" and therefore would not be copyrightable.  *Id.* § 805.5(A).  The Running Man also potentially could be characterized as a "social dance" given that it was widely enjoyed and performed by thousands of members of the public.  *Id.* § 805.5(B). In short, the Running Man is somewhere on the continuum between copyrightable choreography and uncopyrightable dance. *Id.*

1531867, at *11 (E.D. Pa. Mar. 31, 2020).

Fortunately, the question of precisely where on that continuum the Running Man falls does not need to be decided.  Given that the scope of copyright preemption is broader than that of copyright protection, it is sufficient here to find that the Running Man is within the "general subject matter" of copyright under a choreographic work.  *Fin. Info., Inc. v. Moody's Inv'rs Serv.*, 808 F.2d 204 (2d Cir. 1986) (quoting H.R. Rep. No. 1476, 94th Cong., 2d Sess., 131 *reprinted in* 1976 U.S. Code Cong. & Ad. News, 5659, 5747); *see also Berge*, 104 F.3d at 1463; *Alliance for Telcoms. Indus. Sols., Inc. v. Hall*, No. CCB-05-440, 2007 WL 3224589, at *10 (D. Md. Sept. 27, 2007).  Therefore, like the court in *Pellegrino* found as to Leo Pellegrino's "Signature Move," I find that the Running Man dance is within the subject matter of copyright law, satisfying the first prong of the test for copyright preemption.

### b.  The Rights to be Vindicated are Equivalent to those Protected by Copyright

Under the second prong of the copyright preemption test, the rights to be preempted must be equivalent to the rights protected by the Copyright Act.  *Berge*, 104 F.3d at 1463.  Under section 106 of the Copyright Act, copyright owners are granted the exclusive right to: (1) reproduce the copyrighted work; (2) to prepare derivative works; (3) to distribute copies of the copyrighted work by sale, rental, lease, or lending; (4) to perform the copyrighted work publicly; and (5) to display the copyrighted work publicly.  17 U.S.C. § 106.  Under the test provided in *Berge*, a claim avoids preemption when it contains an "extra element that changes the nature of the [] action so that it is *qualitatively different* from a copyright infringement claim."  *Berge*, 104 F.3d at 1463 (internal quotation marks omitted) (emphasis in original).

Courts in this Circuit have repeatedly found that claims based on alleged misappropriation protect the same exclusive rights under the Copyright Act.  *See Progressive Corp. v. Integon P & C Corp.*, 947 F.2d 942 (4th Cir. 1991); *Lowry's Reports, Inc. v. Legg*

*Mason, Inc.*, 271 F. Supp. 2d 737, 756 (D. Md. 2003); *Costar Group Inc. v. Loopnet, Inc.*, 164 F. Supp. 2d 688, 713–14 (D. Md. 2001).  These cases are instructive.

In *Progressive*, the Fourth Circuit upheld the district court's dismissal of Progressive's state law unfair competition and tortious interference claims based on Copyright Act preemption. *Progressive Corp. v. Integon P & C Corp.*, 947 F.2d 942 (4th Cir. 1991).   In that case, Progressive alleged that Integon had copied one of its insurance manuals that contained its method for determining which insurance risks to accept and at what price.   *Id.*   The Fourth Circuit observed that "[c]ourts have consistently held that state unfair competition claims based on misappropriation protect the same rights as Congress sought to protect by the Copyright Act and are therefore preempted."   *Id.* at 942 (citing *Del Madera Properties v. Rhodes and Gardner, Inc.*, 820 F.2d 973 (9th Cir.1987), *abrogated on other grounds by Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994)); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986); *Ehat v. Tanner*, 780 F.2d 876, 877 (10th Cir.1985).  The Fourth Circuit found that the misappropriation claim was "part and parcel of the copyright claim" and was therefore preempted.  *Id.*  Likewise, the Fourth Circuit found that the claim for tortious interference with business relations was preempted, notwithstanding that Progressive had pled the four elements of the tort, which differ from those of a copyright claim.   The key was that although the specific elements of the tort differed, they were still based on the same alleged conduct that was within the scope of copyright protection.   *Id.* ("'[T]he fact that cross-appellants pleaded additional elements of awareness and intentional interference, not a part of the copyright claim, goes merely to the scope of that right; it does not establish qualitatively different conduct on the part of the infringing party, nor a fundamental nonequivalence between the state and federal rights implicated.'") (quoting *Harper & Row Publishers, Inc. v. Nation Enterprises*, 723 F.2d 195, 201 (2d Cir. 1983), *rev'd on other*

*grounds*, 471 U.S. 539 (1985)).

*Lowry* involved a claim for unjust enrichment based on Legg Mason's use of Lowry's proprietary stock market reports.  *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 742 (D. Md. 2003). Legg Mason paid for one subscription of Lowry's reports, but then disseminated the information to its brokers around the country.  *Id.* at 752–53.  On a summary judgment record, the district court held that the Copyright Act preempted Lowry's unjust enrichment claim.  Although Lowry characterized its unfair competition claim as a "hot news" claim, and argued that this type of claim contains "extra elements" not found in the Copyright Act, the Court found that "none of the 'elements' it posits of such a claim describes behavior other than reproduction, performance, distribution, or display."  *Id.* at 756.  Accordingly, the court held that "the 'unfair' conduct of which Lowry's complains does not differ qualitatively from conduct that 'would infringe one of the exclusive rights' granted by the Copyright Act" and was therefore preempted.  *Id.* at 755–56.

The court in *Costar* examined a dispute involving an internet-based company's alleged misuse of real estate photographs owned by the plaintiffs Costar.  *Costar Group Inc.*, 164 F. Supp. 2d at 691.  Costar brought a series of claims, including unjust enrichment, unfair competition, and tortious interference with business relations.  *Id.* at 712.  Costar argued that there were "extra-elements" to these claims that precluded preemption under the Copyright Act.  *Id.* at 713.  But the court disagreed, finding that each of the claims concerned the same act of copying the photographs.  *See id.* at 714 ("The same act which constitutes LoopNet's alleged copyright infringement, the unauthorized copying of CoStar's photographs, also constitutes CoStar's unfair competition claim.  Therefore, this claim does not satisfy the "extra-element" test and so is equivalent to CoStar's claim under the Copyright Act."); *id.* ("[A]s with CoStar's unfair

competition claims, the court fails to discern a true claim for passing off and instead sees only a disguised copyright claim."); *id.* at 715 ("Even accepting CoStar's claims that LoopNet's alleged interference was with existing licenses as opposed to prospective relationships, the present case does not present an additional element . . . . Accordingly, CoStar's intentional interference claim is also preempted by the Copyright Act.").

Like the claims in *Progressive*, *Lowry*, and *Costar*, Brantley and Nickens bring common law claims based on alleged unauthorized copying of the Running Man, and these claims are therefore preempted by the Copyright Act.  I discuss each claim in turn.

First, Brantley and Nickens bring a claim for "Invasion of the Right of Privacy (Publicity)."  Plaintiffs do not elaborate on the distinction between privacy and publicity or allege what state's laws they bring this claim under.   They allege that Epic Games "misappropriated Plaintiffs' identities" by "capturing and digitally copying" their signature movement, the Running Man, to create the emote that "allows the player's avatars to execute the Running Man identically to Plaintiffs' version."  Am. Compl. ¶ 37.  Brantley and Nickens further allege that Epic did not obtain their consent or authorization, and therefore "willfully and intentionally used Plaintiff's [sic] likenesses in violation of their rights of publicity."   Am. Compl. ¶ 38.  Plaintiffs argue that their claim based on misappropriation of their identities and likenesses contains "extra elements" that preclude preemption, citing one case from Maryland and cases from the Third Circuit, Sixth Circuit, the District of New Jersey, and the Central District of California.  ECF No. 28 at 9 (citing *Lawrence v. A.S. Abell Co.*, 475 A.2d 448, 451 (Md. 1984); *McFarland v. Miller*, 14 F.3d 912, 918 (3d Cir. 1994); *Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619, 623 (6th Cir. 2000); *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1027 (3d Cir. 2008); *Prima v. Darden Restaurants, Inc.*, 78 F. Supp. 2d 337, 352–53 (D.N.J.

2000); *Estrada v. Toyota Motor Sales U.S.A., Inc.*, No. CV 08-05992 GAF (AJWx), 2009 WL 10671571, at *7 (C.D. Cal. Feb. 11, 2009).

Of these cases, *Lawrence v. A.S. Abell Co.*, 475 A.2d 448 (Md. 1984) and *McFarland v. Miller*, 14 F.3d 912 (3d Cir. 1994) did not involve preemption.   And while the courts in the remaining cases declined to dismiss rights of publicity claims based on copyright preemption, they do little to save Plaintiffs' claims here.   In other words, even though rights of publicity claims are not preempted in some cases, that does not mean that they avoid preemption in every case.   *Cf. Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 756 (D. Md. 2003) ("The Copyright Act may not preempt every state-law claim of unfair competition.   Some "hot news" claims may yet survive. . . . Lowry's claim, however, does not. The Copyright Act preempts it.")   The key question is whether Plaintiffs state a claim that is "qualitatively different" than the rights protected by the Copyright Act.   *Berge*, 104 F.3d at 1463.   And here Plaintiffs claim is based on Epic Games allegedly "capturing and digitally copying" the Running Man dance to create the *Fortnite* emote that "allows the player's avatars to execute the Running Man identically to Plaintiffs' version."   Am. Compl. ¶ 37.   This is squarely within the rights protected by the Copyright Act.   *See* 17 U.S.C. § 106 (granting copyright owners the exclusive rights to reproduce works, prepare derivative works, distribute copies of work for sale, and perform and display work publicly).   At best Plaintiffs add the conclusory allegation that that the Running Man dance is their "likeness."   Am. Compl, ¶ 38.   But even granting inferences in favor of Plaintiffs, the Court is not obligated to adopt such legal conclusions devoid of further factual enhancement.   *See Ashcroft v. Iqbal*, 556 U.S. at 678.   Therefore, because the rights that Plaintiffs seek to vindicate in their right of publicity/privacy claim are equivalent to those protected by the Copyright Act, namely the reproduction, performance, distribution and display

of the Running Man, this claim is preempted by the Copyright Act and dismissed.

Similarly, Brantley and Nickens' common law unfair competition claim is based on Epic Games' alleged misuse of the Running Man dance and their likeness associated with the dance. Am. Compl. ¶¶ 26–35. Brantley and Nickens argue that public confusion over the origin of the Running Man provides the "extra element" that make the protected rights qualitatively different from the rights protected under the Copyright Act. ECF No. 28 at 8–9. But the rights protected by the unfair competition claims are not qualitatively different from those protected by the Copyright Act because the gravamen of both types of claims is the misappropriation of an original work. The same act which constitutes Brantley and Nickens' unfair competition claim and the rights protected by the Copyright Act is the "copying [of] the original video of the Running Man and/or copying an identical version of that video . . . ." Am. Compl. ¶ 28. The claim for unfair competition is not "qualitatively different" from a claim for copyright infringement and does not describe behavior other than the alleged copying. *Cf. Progressive Corp. v. Integon P & C Corp.*, 947 F.2d at 942; *Berge*, 104 F.3d at 1463; *Lowry's Reports, Inc.*, 271 F. Supp. 2d at 755. Therefore, Brantley and Nickens' unfair competition claims are preempted by the Copyright Act and are dismissed.

Next, Plaintiffs bring a claim for common law unjust enrichment. Brantley and Nickens allege that Epic Games has been unjustly enriched by selling an emote of the Running Man dance on the *Fortnite* electronic storefront. Am. Compl. ¶ 60. This claim is once again based on the alleged misappropriation of the Running Man dance. Am. Compl. ¶¶ 26–35, 60–63. While Brantley and Nickens argue that the rights relating to unjust enrichment are qualitatively different from those under the Copyright Act, they do not seek to vindicate any rights "other than reproduction, performance, distribution, or display." *Lowry's*, 271 F. Supp. 2d 737, 756 (D. Md.

2003).  Therefore, Brantley and Nickens' unjust enrichment claim is preempted by the Copyright Act and is dismissed.

## II.     Plaintiffs Fail to Adequately Allege Lanham Act and Common Law Trademark Claims

Brantley and Nickens bring Lanham Act and trademark-related claims for unfair competition (Count II), trademark infringement (Count V), trademark dilution (Count VII) and false designation of origin (Count VII).  Plaintiffs also add a common law trademark claim (Count VI).  For the Lanham Act unfair competition claim, Plaintiffs do not point to a particular section of the Lanham Act, but cite generally to 15 U.S.C. § 1051 *et seq.* However, based on their allegations of misappropriation and confusion by the public in support of this claim, Am. Compl. ¶¶ 45–46, it will be evaluated under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  *Cf. Dastar Corporation v. Twentieth Century Fox Film Corporation*, 539 U.S. 23, 32 (2003) (evaluating Lanham Act unfair competition claim under Section 43(a)); *Mays & Assocs., Inc. v. Euler*, 370 F. Supp. 2d 362 (D. Md. 2005) (same); *Slep-Tone Entm't Corp. v. Wired for Sound Karaoke & DJ Servs., LLC*, 845 F.3d 1246, 1250 (9th Cir. 2017) (same).  Plaintiffs remaining Lanham Act claims are also brought under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  That section provides as follows:

(a) Civil action

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).   For the reasons discussed below, Plaintiffs' Lanham Act unfair competition and false designation of origin claims are dismissed because the allegations are properly the subject of copyright, not Lanham Act, protection.   The Lanham Act trademark infringement and trademark dilution claims are dismissed because Plaintiffs fail to allege a trademark.   Plaintiffs' common law trademark claim fails for the same reason.

I begin with the Lanham Act unfair competition and false designation of origin claims. As the basis for the unfair competition claim, Plaintiffs allege that Defendants "exploit[ed] and misappropriate[ed] Plaintiffs' likenesses through the improper use of the Running Man" and that Defendants' use of the Running Man "has caused and will continue to cause confusion and mistake by leading the public to erroneously associate the Emote offered by Epic with the Running Man, as executed and associated with Plaintiffs, as exemplified in their online video." Am. Compl. ¶¶ 45–46.   As to the false designation of origin, claim, Plaintiffs simply reincorporate their prior allegations and allege that "Defendants conduct constitutes a false designation, description or representation in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)."   Am. Compl. ¶¶ 89–90.

Although the Copyright Act does not expressly preempt the Lanham Act as another federal statute, similar principles apply based on the areas that Congress designated for each. *See Lions Gate Entm't Inc. v. TD Ameritrade Servs. Co., Inc.*, 170 F. Supp. 3d 1249, 1265 (C.D. Cal. 2016) ("The same kind of [copyright] preemption principle applies for federal Lanham Act causes of action as for state and common-law causes of action.")   In *Dastar Corporation v. Twentieth Century Fox Film Corporation*, the Supreme Court discussed the delineation between Lanham Act and copyright claims.   The Court explained that "origin of goods" provision of §

43(a) of the Lanham Act was designed to prevent consumer confusion as to the source of goods and not "originality or creativity" which is protected by copyright and patent law.  *Dastar Corporation v. Twentieth Century Fox Film Corporation*, 539 U.S. 23, 32 (2003).  The Court held that the phrase "origin of goods" refers only to "the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods."  *Id.  Dastar* therefore instructs that causes of action under § 43(a) of the Lanham Act based on misappropriation and confusion can proceed only where there is confusion as to "the producer of the [] product sold in the marketplace" not the "person or entity that originated the ideas or communications that 'goods [or services]' embody or contain."  *Id.* at 32.

Following *Dastar*, courts have dismissed Lanham Act claims where the allegations pertain to copying ideas or concepts.  For example, as particularly relevant here, the court in *Pellegrino* dismissed Plaintiff's false designation of origin claim under the Lanham Act based on Epic allegedly copying Plaintiff's signature move to create the "Phone It In" emote.  The court explained:

> The[] allegations establish that the Signature Move is the creative idea underlying Epic's tangible good, the Phone It In emote.  Furthermore, the Complaint does not plausibly allege that there was or could be any confusion as to who produced the Phone It In emote.  At best, the Complaint alleges that there is confusion over who originated the Signature Move embodied in the Phone It In emote because Epic does not "credit[ ] Pellegrino as the dance's creator and owner."  (*Id.* ¶ 47.)  Under *Dastar*, a claim that concerns the origin of an idea embodied in a tangible good is governed by copyright law, not the Lanham Act.

*Pellegrino v. Epic Games, Inc.,* No. CV 19-1806, 2020 WL 1531867, at *6 (E.D. Pa. Mar. 31, 2020).  *See also Mays & Assocs., Inc. v. Euler*, 370 F. Supp. 2d 362 (D. Md. 2005) (dismissing unfair competition claim under § 43(a) of the Lanham Act where images posted on website were not for sale and distribution and embodied only creative work); *Slep-Tone Entm't Corp. v. Wired for Sound Karaoke & DJ Servs.*, LLC, 845 F.3d 1246, 1250 (9th Cir. 2017) (affirming dismissal

of Lanham Act § 43(a) claims for unfair competition and trademark infringement where Defendant did not use Plaintiff's marks to sell its karaoke files, but allegedly used the content of Plaintiff's karaoke tracks without authorization); *Lions Gate Entm't Inc. v. TD Ameritrade Servs. Co.*,170 F. Supp. 3d 1249 (C.D. Cal 2016) (dismissing Lanham Act § 43(a) claims for unfair competition and false designation of origin, finding allegations Defendant's use of elements from the film *Dirty Dancing* including the famous "dance lift," did not cause confusion over source of tangible goods offered for sale, but only the ideas and concepts embodied in those goods).

Here, like in *Pellegrino*, Plaintiffs do not allege facts that suggest there is confusion regarding the producer of a tangible product sold in the marketplace.  At best the allegations indicate that each Plaintiff might be a "person or entity that originated the ideas or communications that 'goods [or services]' embody or contain," but this fails to establish a Lanham Act claim.  *Dastar,* 539 U.S. at 32.  Therefore, these claims are dismissed.

Next, I address Plaintiffs' trademark infringement and trademark dilution claims under the Lanham Act.  These claims are dismissed because Plaintiffs fail to allege that the Running Man dance is a valid trademark and it does not identify a good or service.  Federal trademark law defines the term "trademark" to include any "word, name, symbol, or device, or any combination thereof" that is used to identify and distinguish unique goods or services.  15 U.S.C. § 1127.  Accordingly, there are two requirements for a trademark, first that the object in dispute meets the definition of a "word, name, symbol, or device" and second, that it be used to identify and distinguish a unique good or service.  Additionally, trademarks themselves are not goods or services, but rather "instruments to identify goods and services."  *Radiance Found., Inc. v. N.A.A.C.P.*, 786 F.3d 316, 327 (4th Cir. 2015).

Plaintiffs allege that their trademark is the Running Man and that it has become distinct

and immediately recognizable.  Am. Compl. ¶¶ 64, 73.  This trademark is allegedly based on Plaintiffs' "likeness."  *Id.* at ¶¶ 65, 75.  To the extent this is more than a conclusory allegation, as a general rule images and likenesses do not function as trademarks.  *ETW Corp. v. Jireh Publ'g*, 322 F. 3d 915, at 922-923 (6th Cir. 2003) ("Images and likenesses [] are not protectable as a trademark because they do not perform the trademark function of designation.").

Moreover, Brantley and Nickens have not adequately alleged how the Running Man dance is used to identify a unique good or service.  In its brief in opposition, Brantley and Nickens argue that the Running Man dance is a trademark for performances by Plaintiffs.  ECF No. 28 at 32.  This argument is too clever by half.  The Running Man dance cannot be a trademark for performances of the Running Man dance.  *See Radiance Found., Inc.*, 786 F.3d 316, 327 (4th Cir. 2015) (explaining that a trademark cannot be in itself a "good[] or service," but is rather an "instrument to identify a good[] [or] service[].")  Therefore, Brantley and Nickens' Lanham Act trademark infringement and trademark dilution and common law trademark infringement claims are dismissed for failure to allege a trademark.

Finally, Plaintiffs allege as part of their Lanham Act unfair competition and trademark infringement claims that Defendants actions have "creat[ed] the false impression that Plaintiffs endorsed Fortnite."  Am. Comp. ¶¶ 47, 65.  Although Plaintiffs did not plead this as a separate cause of action, I address it as an alternative theory of liability.

"In an action for false endorsement, the plaintiff must prove the likelihood of consumer confusion as to the origin, approval or endorsement of the product."  *Comins v. Discovery Commc'ns, Inc.*, 200 F. Supp. 2d 512, 522 (D. Md. 2002) (citing *Waits v. Frito–Lay, Inc.*, 978 F.2d 1093, 1110 n.9 (9th Cir.1992)).  Several other courts have dismissed false endorsement claims based on the principles of *Dastar*.  For example, in *Rudovsky v. W. Publ'g. Corp.*, No. 09

Civ. 00727, 2010 WL 2804844, at *1–2 (E.D. Pa. July 15, 2010), the court held that claims under the Lanham act for false endorsement were precluded by *Dastar*.  In that case, plaintiffs were two law professors that sued West publishing company after it published a supplement to a treatise authored by the plaintiffs without their knowledge and with their names listed as authors. *Id.*  The *Rudovsky* court explained that allowing a false endorsement claim would lead to the very conflict between Lanham Act and copyright liability that the Supreme Court was seeking to avoid in *Dastar*:

> [T]o accord "special treatment" to "communicative products" - that is, to read the word "origin" in the Lanham Act to cover the authors of communicative products - would "cause[ ] the Lanham Act to conflict with the law of copyright, which addresses that subject specifically." [*Dastar*, 539 U.S. at 33.]  The Court held that:
>
>> Another practical difficulty of adopting a special definition of "origin" for communicative products is that it places the manufacturers of those products in a difficult position.  On the one hand, they would face Lanham Act liability for failing to credit the creator of a work on which their lawful copies are based; and on the other hand they could face Lanham Act liability for crediting the creator if that should be regarded as implying the creator's "sponsorship or approval" of the copy, 15 U.S.C. § 1125(a)(1)(A).
>
> *Dastar*, 539 U.S. at 36.  The defendants here would be placed in precisely this position if the Lanham Act claims, particularly the false endorsement claim, were permitted to go forward.

*Rudovsky v. W. Pub. Corp.*, No. 09-CV-00727-JF, 2010 WL 2804844, at *1–2 (E.D. Pa. July 15, 2010).  In other words, while *Dastar* dealt with an unfair competition claim under the Lanham Act, the same principles applied to claims for false endorsement.  *See also Romantics v. Activision Publ'g, Inc.*, 532 F. Supp. 2d 884, 889 (E.D. Mich. 2008) (false endorsement claim for use of song in video game barred by *Dastar*); *Lions Gate Entm't v. TD Ameritrade Servs. Co., Inc.*, 170 F. Supp. 3d 1249, 1266 (C.D. Cal 2016) (false association claim based on "dance lift" barred by *Dastar*).

In *Pellegrino*, the court declined to dismiss a claim for false endorsement, finding that

such claims were not necessarily barred by *Dastar*.  In that case, the court distinguished *Rudokvosky* and found that Plaintiff's allegations that Epic Games used his likeness did not depend on the authorship or origin of his signature move and therefore stated a distinct claim for false endorsement.  *Pellegrino v. Epic Games, Inc.*, No. CV 19-1806, 2020 WL 1531867, at *7 n.5 (E.D. Pa. Mar. 31, 2020).  Even if the allegations in that case supported such a distinction, here they do not.  Plaintiffs allegations regarding false endorsement are based on copying the Running Man dance and the conclusory allegation that Epic Games used their likeness.  Comp. ¶¶ 47, 65.  A false endorsement claim based on these allegations would lead to the type of conflict between the Lanham Act and the copyright law that the Supreme Court sought to avoid in *Dastar*.  Therefore, Plaintiffs' Lanham Act claims based on false endorsement are dismissed.

## III.   Dismissal with Prejudice

For the reasons stated above, all of Plaintiffs' claims are dismissed.  This dismissal is with prejudice.  "'The determination whether to dismiss with or without prejudice under Rule 12(b)(6) is within the discretion of the district court.'" *Weigel v. Maryland*, 950 F. Supp. 2d 811, 825–26 (D. Md. 2013) (*quoting 180S, Inc. v. Gordini U.S.A., Inc.*, 602 F. Supp. 2d 635, 638–39 (D. Md. 2009)).  Generally, the plaintiff should be afforded an opportunity to amend, or dismissal should be without prejudice.  *See Adams v. Sw. Va. Reg'l Jail Auth.*, 524 F. App'x 899, 900 (4th Cir. 2013) ("Where no opportunity is given to amend the complaint, the dismissal should generally be without prejudice.").  Here, Plaintiffs were given an opportunity to amend and did so after Defendants previously raised these deficiencies with the pleadings in accordance with my pre-motion procedure.  *See* ECF Nos. 3, 17, 18, 21, 25.  Therefore further amendment would be futile and the claims are dismissed with prejudice.

**Conclusion**

Plaintiffs seek to place the same square peg into eight round holes in search of a cause of action against Epic Games for its use of the Running Man dance in its game *Fortnite*.  But Plaintiffs' claims that Epic Games copied the dance do not support any of their theories.  Plaintiffs' common law causes of action for invasion of the right of privacy/publicity, unfair competition, and unjust enrichment are dismissed based on preemption under the Copyright Act.  Similarly, their claims for unfair competition and false designation of origin under the Lanham Act are dismissed because their allegations are in the domain of copyright law and not the Lanham Act.  Finally, Plaintiffs remaining Lanham Act and common law trademark claims are dismissed for failure to plausibly allege a valid trademark.  Because Plaintiffs already amended their complaint once in light of these deficiencies, further amendment would be futile and Plaintiffs' claims are dismissed with prejudice.


**ORDER**

For the reasons stated in this Memorandum Opinion and Order, it is this 29th day of May 2020, hereby ORDERED that

1. Defendants' Motion to Dismiss, ECF No. 26, is GRANTED;

2. Plaintiffs' claims are DISMISSED WITH PREJUDICE;

3. The CLERK is directed to CLOSE this case.

_____/S/_____
Paul W. Grimm
United States District Judge
